AO 91 (Rev. 11/11)   Criminal Complaint

**FILED**

## UNITED STATES DISTRICT COURT

for the

Eastern District of California

MAR 25 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| **DARNELL RAY OWENS** | ) | 2:19 - MJ - 45 |
| | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____March 21, 2018 - present_____ in the county of _____Sacramento_____ in the

_____Eastern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 876(c) | Interstate Threats and |
| 18 U.S.C. § 1038(a) | Hoax Involving Biological Weapons |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
_Complainant's signature_

SA Stacy Landrus, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 8-21-19

_____
_Judge's signature_

City and state:   Sacramento, California

Deborah Barnes, U.S. Magistrate Judge
_Printed name and title_

1  McGREGOR W. SCOTT
United States Attorney
2  SHEA J. KENNY
Assistant United States Attorneys
3  501 I Street, Suite 10-100
Sacramento, CA 95814
4  Telephone: (916) 554-2700
Facsimile: (916) 554-2900
5
Attorneys for Plaintiff
6  United States of America

7
IN THE UNITED STATES DISTRICT COURT
8
EASTERN DISTRICT OF CALIFORNIA
9

10
| In the Matter of a Criminal Complaint and | CASE NO. |
11 | Arrest Warrant for DARNELL RAY OWENS | |
| and the Search of ▓▓▓▓▓▓▓ | AFFIDAVIT IN SUPPORT OF A CRIMINAL |
12 | Sacramento, CA and the Person of DARNELL | COMPLAINT, ARREST WARRANT, AND AN |
| RAY OWENS, and any digital devices found | APPLICATION UNDER RULE 41 FOR A |
13 | therein or thereon | WARRANT TO SEARCH AND SEIZE |

14

15

16
1.      I, Stacy Landrus, being first duly sworn, hereby depose and state as follows:
17
## I.      INTRODUCTION
18
2.      I make this affidavit in support of a criminal complaint and arrest warrant for DARNELL
19
RAY OWENS for violations of Title 18, United States Code Section 876(c) – Mailing Interstate Threats,
20
and Title 18, United States Code Section 1038(a) – Hoax Involving Biological Weapons.  I also make
21
this affidavit for an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant
22
to search the premises known as ▓▓▓▓▓▓▓▓▓▓ Sacramento, CA, hereinafter "PREMISES," further
23
described in Attachment A-1, including any digital devices found at the premises, and for the person of
24
DARNELL RAY OWENS, as further described in Attachment A-2, including for digital devices found
25
on his person, for the things described in Attachment B.
26
3.      As described below, I submit that there is probable cause that DARNELL RAY OWENS
27
mailed from Sacramento, California no less than two letters containing a white powder with the intent
28

AFFIDAVIT                                    1

1   that the recipients mistakenly believed the powder was a biological weapon, and that one of the letters

2   contained a threat to injure the pastor of a church.  As discussed below, DARNELL RAY OWENS

3   appears to have sent these and many other similar letters as part of a family quarrel with the purpose of

4   having his father and others associated with his father erroneously targeted as the senders of the letters.

## II.  BACKGROUND

### A.  Agent Background

7   4.   I am a Special Agent with the Federal Bureau of Investigation, and have been since

8   August 2004.  I was trained at the FBI Academy in Quantico, Virginia.  I have assisted or led

9   investigations with respect to numerous violations of federal law, and participated in the execution of at

10   least 25 federal search warrants.  In my investigations, I have also consulted with forensic examiners and

11   specialists with respect to the examination of digital and electronic evidence.

12   5.   I am currently assigned to a White Collar Crime squad of the FBI's Sacramento Division

13   and currently work on public corruption matters, color of law violations, and civil rights violations,

14   among other federal criminal violations.

15   6.   I am an investigative or law enforcement officer of the United States, within the meaning

16   of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations

17   of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

18   7.   The facts set forth in this affidavit are based upon my personal observations, my training

19   and experience, and information obtained from other agents, witnesses, and organizations or records

20   obtained during the course of the investigation.  This affidavit is intended to show only that there is

21   sufficient probable cause for the requested complaint and warrants and does not set forth all of my

22   knowledge about this matter.

### B.  Applicable Law

#### Mailing Interstate Threats

25   8.   Title 18, United States Code Section 876 provides, in relevant part, that it is a felony for

26   any person who "knowingly" "deposits in any post office or authorized depository for mail matter, to be

27   sent or delivered by the Postal Service or knowingly causes to be delivered by the Postal Service

28   according to the direction thereon," "any communication with or without a name or designating mark

1  subscribed thereto, addressed to any other person and containing . . . any threat to injure the person of

2  the addressee." 18 U.S.C. §§ 876(a), 876(c). It is my understanding based on my training and

3  experience and in discussing the matter with the Assistant United States Attorney involved in the

4  investigation that a violation "addressed to any other person" under § 876(c) means a natural person or

5  persons, including identified by title, and that in determining whether the threat has been addressed to a

6  natural person or persons, the fact finder may consider the packaging, the salutation, and the complete

7  contents of the communication. *See United States v. Keyser*, 704 F.3d 631, 635, 641 (9th Cir. 2012)

8  (holding that threatening letter mailed to "manager" of business met definition of "addressed to any

9  other person" under § 876(c) despite absence of specific name); *United States v. Havelock*, 664 F.3d

10 1284, 1296 (9th Cir. 2012) ("[I]n order to determine whom a threatening communication is 'addressed

11 to,' a court may consult the directions on the outside of the envelope or the packaging, the salutation

12 line, and the contents of the communications"). It is similarly my understanding based on my training

13 and discussions that, in order to violate § 876, a person need not have the intent to actually injure a

14 natural person or even the capability to carry out the threat, but only the intent to threaten the natural

15 person or acted with the knowledge that the communication would be viewed as a threat.

16              Hoax Involving Biological Weapons

17    9.      Title 18, United State Code Section 1038(a), provides, in relevant part, that it is a felony

18 for any person who "engages in any conduct with intent to convey false or misleading information under

19 circumstances where such information may reasonably be believed and where such information

20 indicates that an activity has taken, is taking, or will take place that would constitute a violation of

21 chapter 10 of this title." Under Chapter 10 of Title 18, it is a felony for any person who "develops,

22 produces, stockpiles, transfers, acquires, retains or possesses any biological agent, toxin or delivery

23 system for use as a weapon." 18 U.S.C. § 175.

24              III.    **PROBABLE CAUSE**

25    **A.**   **Origin and Overview of Investigation**

26    10.     On or about March 21, 2018, I received information from ▮▮▮▮▮▮▮▮▮, the director

27 of the Sacramento County LGTBQ Center, concerning a potential hate crime. The director stated that

28 two letters were sent to the Sacramento LGTBQ Community Center that included homophobic threats.

AFFIDAVIT                                    3

The return addresses and names of the purported senders of the two letters were R██████ S███████, who as I later learned, is the father of DARNELL RAY OWENS, and A████ F█████, who is a friend of R████ S███████. The FBI opened a criminal investigation relating to the threats and I was the case agent assigned to the investigation.

11.     Over the course of the investigation, I have obtained and reviewed approximately 50 letters and online complaints. These letters were obtained from law enforcement agencies throughout Northern California as well as other jurisdictions. Some of the letters were sent directly to the law enforcement agencies. Others were mailed to individuals and organizations who reported the threats to their local law enforcement. The majority of the letters sent via US Postal Service were post-marked from Sacramento, California, and sent between February 2018 through March 2019.

12.     In addition to these letters, I have also obtained records from other sources, including the Los Rios Community College District relating to DARNELL RAY OWENS, as well as letters or other writing from DARNELL RAY OWENS. I have also obtained and reviewed police reports, including reports of interviews, relating to some of the recipients of the letters referenced above.

13.     In addition, I have also interviewed some of the recipients of the letters, including B██ L██████, M███ T████, D███ H███████, I████ B█████ and M████ D███. I have also interviewed R████ S███████ and D██████ A██████, who were identified as the purportedly sending some of the threat letters.

14.     As discussed in greater detail below, I submitted some of the letters and other documents obtained through the investigation to be forensically examined by the FBI's laboratory in Quantico, VA, including for the presence of DNA. I have had discussions with the FBI's forensic examiner and have reviewed his findings.

15.     I have also discussed the case with U.S. Postal Inspector Roxanne LeMaire, who is also investigating the threats. I have reviewed Postal Inspector LeMaire's reports as well as information she obtained through her investigation, including witness interviews. I have also learned from Postal Inspector LeMaire that the letters were mailed from United States Post Office boxes in Sacramento, California and Oakland, California.

16.     The affidavit is based on this evidence as well as other evidence as discussed below.

**B.**   **There is Probable Cause that Darnell Owens Mailed an Interstate Threat and Has Conducted a Hoax Regarding Biological Weapons**

      1.    **Evidence of Threat and Other Letters and On-Line Complaints Sent to Numerous Entities and Individuals in Connection with Apparent Family Dispute Between DARNELL RAY OWENS and his Father R██████ S██████**

17.    During the time frame of February 2018 through present, approximately 45 letters have been mailed through U.S. Postal Service to various individuals, organizations, and law enforcement entities in the northern California area and throughout the United States. The majority are all post marked as being mailed from Sacramento, California, with two from Oakland, California.

18.    As a general matter, many of the letters contain threats to kill police officers, other government officials, homosexuals, and "white people," and to try to incite a race war.

19.    The handwriting on the letters is distinctive and appears to have been written by the same individual.

20.    The first known letters were mailed in February 2018 to an apartment complex called ██████████████ in Sacramento, California. The letters included complaints and allegations about a tenant named R████ S████ The return address and the names of the purported senders of these letters were relatives or acquaintances of R████ S████.

21.    Thereafter, on about March 19, 2018, D██ H████████ reported receiving two letters at the Sacramento LGBTQ Community Center. The letters had return addresses of R████ S████ ████████████████ Sacramento, CA 95842 and A████ F████, ████████████████ Sacramento, CA 95834. The letters contained hate speech against homosexuals, and threatened to "murder every fag or queer, lesbian, transsexuals, transgenders in Sacramento."

22.    On or about March 26, 2018, Sacramento Police Department received a letter with a return address of R████ S████ ██ ████████████████ Sacramento, CA 95842. The letter referred to police officers as "pigs" and claimed that they are sacrificing people of color in order to create a "race war." The author claimed to be a prophet "Eleanor Israel" and stated that "God Yahweh ben yahweh will punish you pigs and I will murder you pigs with my words and weapons…Yahweh has said the tribe of essau (white people) is a abomination…"

23.    On or about April 10, 2018, I along with others interviewed R████ S████.

1   R█████ S██████ denied having any knowledge about any letters or mailings. S█████ did state that

2   he was the subject of a Sacramento Housing Authority review because they received a letter accusing

3   him of violating Section 8 housing rules at his apartment complex. S█████ consented to providing

4   interviewing agents with a buccal swab DNA sample.

5       24.    I also interviewed the property manager of R█████ S██████ apartment complex.

6   The manager stated that R█████ S█████ appears to be of below-average intelligence and will

7   routinely come to the property manager's office to watch the same children's movie on repeat in the

8   lobby. The officer manager's opinion of R█████ S█████ was consistent with my own observations

9   based on the interview of R█████ S█████

10      25.    On or about March 29, 2018, West Sacramento Police Department received a letter with a

11  return address of A███ F████, █████████████ Sacramento, CA 95834. The letter writer

12  stated "If I had a gun, I blow your brains out. I am sick and tired of you white cops getting away with

13  murder...I'mma do something crazy to you bitches...I wanna hurt someone bad...I wanna killed a cop

14  and drink his white blood...I'm ready to die to take out some of you off this earth...I'm coming soon for

15  your essau..."

16      26.    On or about April 30, 2018, the FBI Public Access Line received an online complaint

17  purportedly from A███ F████, email address █████████████, ████████████

18  Sacramento, CA 95842. The complaint claimed that R█████ S█████ █████████████

19  Sacramento, CA 95842, was in a cult called the House of Yahweh and talking about terrorism, death to

20  white people and starting a race war. The message was sent from IPv6 address

21  █████████████████████, which converts into IPv4 address ████████████

22      27.    As discussed below, this IP address is for the home of the current girlfriend of

23  DARNELL RAY OWENS, and where he is presently residing.

24      28.    In June 2018, the Sacramento LGTBQ Community Center received another round of

25  threat messages, this time via their website contact page. These were purportedly sent by individuals,

26  including J██ P██ and "S██ A█████" who I understand based on witness interviews have some

27  familial or other connection to R█████ S█████ or DARNELL RAY OWENS. That same month,

28  another threat letter purported sent by "S██ A█████" was mailed to the Sacramento County

AFFIDAVIT                                              6

1  Department of Revenue Recovery.

2      29.    In July 2018, additional threat letters were mailed. These included a letter purportedly

3  sent by R▓▓▓ S▓▓▓ to the Human Rights Campaign and, as discussed next, a threat letter to a

4  pastor at a church in Texas.

5      30.    Also in July, 2018, the FBI Public Access Line received an online complaint purportedly

6  from M▓▓▓ P▓▓▓, ▓▓▓▓▓▓▓▓ Rancho Cordova, CA, accusing

7  A▓▓ F▓, R▓▓▓ S▓▓▓ S▓▓ A▓▓ and A▓ F▓▓▓ of being in the House of

8  Yahweh cult, talking about attacking a police department and discussing domestic terrorism. The

9  message was sent from IPv6 address ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, which converts into IPv4

10  address ▓▓▓▓▓. This is the same IP address as for the purported complaint from A▓

11  F▓.

12      31.    A▓ F▓▓ was interviewed by U.S. Postal Inspector Roxanne LeMaire. F▓

13  stated that he is best friends with R▓▓▓ S▓▓▓, who is the father of DARNELL RAY OWENS

14  and R▓▓ S▓▓▓. F▓▓ advised that DARNELL RAY OWENS and R▓▓▓ S▓▓▓ had

15  been in an argument with their father R▓▓ S▓▓▓ about the parties they were having at their

16  father's apartment and their father told them they needed to move out of the residence.

17      32.    F▓▓ said that he has had threatening and harassing letters mailed to him and that there

18  have been a lot of unwanted magazine subscriptions mailed to his residence in his name and his friend

19  (Y▓▓ P▓▓) name. F▓▓ denied sending any threats.

20      33.    Postal Inspector LeMaire also interviewed Y▓▓ P▓▓ who said she is the

21  caretaker of A▓ F▓▓ and is cousin to R▓▓▓ S▓▓▓ and DARNELL RAY OWENS, and

22  that she grew up with their father R▓▓ S▓▓▓. P▓▓ stated that she has not seen either

23  R▓ or Darnell since the holidays.

24      34.    P▓▓ reported that her daughter, M▓▓ P▓▓, has also received threats and

25  has had police contact due to false reports of child abuse. P▓▓ stated the claims were found to be

26  false and the investigation was dropped.

27      35.    P▓▓ also provided to Inspector LeMaire a letter that was mailed to Utah Data

28  Center, N11600 W. Saratoga Springs, UT 84045 with a return address of Y▓▓ P▓▓, ▓▓▓

1  ███████████████ Sacramento, CA 95834. The letter was returned to sender for insufficient address;

2  however, P█████ denied mailing the letter and advised that the return address was also incorrect.

3  P█████ never opened the letter and voluntarily gave it to Postal Inspector LeMaire for the

4  investigation. P█████ provided consent to open the letter too.

5        36.     Postal Inspector LeMaire opened the letter. According to Postal Inspector LeMaire, who

6  has received and reviewed the threat letters discussed in this affidavit, it is the same handwriting and

7  same content as the other threat letters.

8          2.   **Evidence of a Threat Letter Containing White Powder Mailed to a Pastor in**
               **Texas**

9

10        37.     On or about July 13, 2018, the First Baptist Church Dallas, P.O. Box 223609, Dallas, TX

11  75222 received a letter containing white powder, purported to be addressed from S███ A████████, █████

12  ██████████ Sacramento, CA 95822. The letter stated in part, "I will assassinate your pastor in the name

13  of Allah, I will burn down Christian churches...This is a threat."

14        38.     I interviewed R███ C███████ who is Head of Security. C███████ told me that the church's

15  mail is opened by the ladies that work in the office, and they received the threat letter. C██████ stated

16  that they immediately notified him and he notified the authorities. C██████ told me he absolutely

17  believed that the threat was serious and took immediate action to limit everyone's exposure to the

18  powder.

19        39.     I interviewed B███ L███████, who is the Executive Pastor. L██████ felt very threatened by

20  the contents of the letter. He told me that the church is well-known and has a high potential for attacks.

21  L█████ had additional concerns because there were numerous people at the church that day, preparing

22  for children's vacation bible school. He told me that the church had to take extra security precautions

23  after receiving the letter.

24        40.     I have interviewed D█████ A████████. A███████ stated that she typically goes by her

25  full name but is occasionally referred to as "S████" but only by some family members. She explained

26  that she is a distant cousin to DARNELL RAY OWENS who knows her as S███. A█████ provided

27  the following familial relationship information:

28      &bull;   DARNELL RAY OWENS' parents are L████ O████ (aka S███████) and R████████

1    S██████

2    • DARNELL RAY OWENS has a sister, R████ S████

3    • DARNELL RAY OWENS has a girlfriend, S███ I████ aka S████ J█

4    • A██ F████ ex-wife is J█ F████ (aka ████ who is L████ O█████ aunt.

5    • R████ S████ and A██ F████ grew up together and are close friends.

6    41.    A█████ stated she moved back to the Sacramento area in October 2017, but did not have any contact with any of the above family members, and had not provided her address to anyone. In April 2018, A█████ saw DARNELL RAY OWENS on the light rail train. Shortly thereafter, A█████ received a message via Facebook Messenger from DARNELL RAY OWENS asking for her mailing address for the purpose of mailing her a birthday card. A█████ responded and sent DARNELL RAY OWENS her address at ████████ in Sacramento, California. A████████ received a birthday card from DARNELL RAY OWENS in early May 2018.

13    42.    As noted, it was shortly after A█████ provided DARNELL RAY OWENS her address that threat letters purportedly from "S███ A█████" at that address were mailed to various individuals and organizations. A█████ denied having sent any threat letters to anyone, including the First Baptist Church in Texas.

17    3.    **Additional Biological Weapons Hoax Letter Mailed from Sacramento, CA**

18    43.    On or about August 3, 2018, the Sacramento County Department of Revenue Recovery received a letter containing white powder, purportedly addressed from R████ S████, ████████ ████████ Sacramento, CA 95842. The letter stated in part, "Yahweh has sent me to destroy all Esau/Edomites, so-called white people...I will burn down the department of Revenue Recovery and kill a lot of people. I am a Hebrew warrior and a domestic terrorist."

23    44.    Upon receipt of the letter, the Sacramento Police Department and the Sacramento Fire Department were called. The Fire Department engaged in their protocol to decontaminate the area of a suspected biological toxin. I interviewed ████████ who received the letter. She told me she was very frightened when the powder spilled onto her hands and had never been so scared.

27    45.    This was the second threat letter mail to that office. As noted, in June 2018, a threat letter purportedly sent from "S███ A█████" was also mailed to that office. A█████ denied sending

1  that letter.

2        4.  **Additional Threat Letters Are Mailed from Sacramento, CA**

3       46.    On or about September 22, 2018, the Elk Grove Police Department received a letter

4  addressed from A█████ F████████, ████████████ Elk Grove, CA 95758. The letter stated in

5  part, "I must take a gun and assassinate the police, the Elk Grove mayor and racist white people in

6  general…"

7       47.    On or about October 1, 2018, the Office of the State Fire Marshall received a letter

8  addressed from T████ E████ ████████████, Sacramento, CA 95824. The letter stated in part, "I

9  will burn down every fire station in Sacramento and murder everyone with fire or a powerful gun. This

10  is a threat. Allah has promised me glory and heaven for doing his will…I will kill anyone who get in my

11  way."

12       48.    That same day, on or about October 1, 2018, the San Antonio, Texas Police Department

13  received a letter in which the purported author, S█████ P████ threatened to kill police officers, "white

14  people, "and bomb the police station.  The San Antonio Police Department obtained a DNA sample

15  from the letter.

16       49.    On or about October 24, 2018, television news station KTXL Fox40 received a letter

17  addressed from E████ T████████ ████████████ Sacramento, CA 95820. The letter stated in part, "I

18  am sick and tired of my baby mama…I am going to kill her and my children. I am also going to kill

19  ████████, ████████, ████████, ████████ etc. Allah has commanded me to burn

20  down the news station with fire and murder anyone…I am a domestic terror…I am ready to die. This is

21  a threat and a promise. I am here to kill a lot of people in the name of Allah…" ████████, ████████

22  ████████, and ████████ are employees of KTXL Fox40, and each is listed on KTXL

23  Fox40's website in the "Contact Information" section.

24       50.    On or about March 21, 2019, the Sacramento County District Attorney Anne Marie

25  Schubert's Office received a letter addressed from A████ F████, ████████████ Antelope, CA

26  95843. The letter stated in part, "Dear Anne Marie Schubert (District Attorney) . . . You have failed this

27  city and the people. So I am making a threat on your Life, I will assassinate you with a bullet to your

28  head, you will not survive I will watch your body shake as the life in you leaves. . . . The house of

1  Yahweh ben Yahweh organization will destroy all white (Esau) people and bring heaven to earth." The

2  handwriting and contents appear similar to the other letters believed to be sent by DARNELL RAY

3  OWENS.

4          5.      **DNA Evidence that Darnell Owens Mailed the Threat and Hoax Letters**

5          51.     At my request, D████A████ provided me the birthday card she received from

6  DARNELL RAY OWENS. I sent this card along with some of the threat letters to the FBI Laboratory

7  in Quantico, VA for a forensic analysis, including for the presence of DNA.

8          52.     The FBI Laboratory in Quantico analyzed DNA from the birthday card DARNELL RAY

9  OWENS sent to A████ and compared it to the known DNA sample from R████ S████ that he

10  voluntarily provided. The forensic examiner determined that the DNA from the birthday card is

11  approximately 7.1 million times more likely to be from the son of R████ S████ than from

12  someone unrelated. Therefore, the DNA from the birthday card was used as an alternate reference DNA

13  profile for DARNELL RAY OWENS.

14          53.     The DNA profile for DARNELL RAY OWENS was compared to the DNA obtained

15  from the threat letters received by Sacramento Police Department, West Sacramento Police Department

16  and the First Baptist Church, Dallas. The forensic examiner determined that the DNA on each letter was

17  a match to DARNELL RAY OWENS.

18          54.     Additionally, a forensic scientist with the Bexar County Criminal Investigation

19  Laboratory in San Antonio, Texas, matched the FBI's DNA profile in CODIS for DARNELL RAY

20  OWENS to the DNA that the San Antonio Police Department recovered from the threat letter mailed to

21  them in late September 2018.

22          55.     The Sacramento County laboratory obtained a DNA sample from the threat letter to

23  KTXL FOX 40 and matched the sample to the FBI's DNA profile in CODIS for DARNELL RAY

24  OWENS.

25          6.      **Further Evidence that Darnell Ray Owens Mailed the Conclusion of**
              **Probable Cause**

26

27          56.     As noted, all of the letters have a distinct handwriting style based on my observation.

28  The diction and threats are consistent, including recurring, obscure references to biblical or religious

1    terminology, as well as the target of the threats.

2         57.    I have compared the handwriting, and in particular, some of the numerals written on the

3    threat letters, to that found on envelope and birthday card DARNELL RAY OWENS sent to A▓▓▓▓.

4    The handwriting on the letters appears the same on the card.

5         58.    Additionally, I have obtained copies of the applications for fee waivers that DARNELL

6    RAY OWENS submitted to the Los Rios Community College District.  I have compared this

7    handwriting to the handwriting on the threat and hoax letters.  The handwriting, in particular the

8    numerals on DARNELL RAY OWENS applications appears the same as the threat letters.

9         59.    U.S. Postal Inspector LeMaire interviewed J▓▓ P▓▓▓ who stated that her niece

10    (R▓▓▓▓▓ S▓▓▓▓▓) and nephew (Darnell Owens) have been mailing threatening and harassing letters

11    to different members of her family for months.  P▓▓▓ reported that S▓▓▓▓ had a falling out with her

12    (S▓▓▓▓▓) father R▓▓▓▓ S▓▓▓▓ and that is when the letters began.

13         60.    Postal Inspector LeMaire also interviewed R▓▓ H▓▓▓, who stated that she is the

14    grandmother to R▓▓▓▓ S▓▓▓▓ and DARNELL RAY OWENS, and the mother to R▓▓▓

15    S▓▓▓▓ (father to R▓▓▓ and Darnell).  H▓▓ reported that R▓▓ S▓▓▓ contacted her a

16    while back to say that she has been out of town and claimed that people are lying about her sending

17    letters.  (One of the first complaint letters to R▓▓▓ S▓▓▓▓ s apartment complex was purportedly

18    sent by R▓▓▓ S▓▓▓▓).

19         61.    ▓▓▓ also showed Postal Inspector LeMaire different letters that have been mailed to

20    ▓▓▓▓ stated she believed the letters were sent by DARNELL RAY OWENS and R▓▓▓

21    S▓▓▓ Postal Inspector LeMaire reviewed the letters.  She observed that they were of the same

22    handwriting and contents of the other threat letters.

23         62.    ▓▓▓ stated that she has not seen or had any recent contact with her grandchildren due to

24    the ongoing conflicts.

25         63.    Postal Inspector LeMaire reported that she was able to trace some of the stamps used on

26    some of the initial threat letters to a particular credit card with the number ending 6649 that was used to

27    purchase the stamps.  The stamps were purchased at the Elk Grove Laguna Post Office on October 28,

28    2017. In investigating the credit card, the credit card company informed Postal Inspector LeMaire that

AFFIDAVIT                                 12

1  the owner of the credit card, ████████, had previously filed a claim for a fraudulent charge on his
2  credit card. The credit card company informed Postal Inspector LeMaire that it is possible the purchase
3  of the stamps was another fraudulent transaction that had not noticed by the credit card owner. Law
4  enforcement agents have been unable to locate ██████, but it appears that there is no link between Mr.
5  ████ and DARNELL RAY OWENS.

6           7.     **Current List of Recipients of Threatening Letters**

7           64.    As discussed, no less than 45 of letters have been mailed by, I submit there is probable
8  cause to believe, DARNELL RAY OWENS. These primarily consists of threats, although the letters to
9  some individual relatives or acquaintances of DARNELL RAY OWEN or R████ S██████ are more
10 harassing in nature as opposed to necessarily including specific threats to injure.

11          65.    I have made inquiries through various databases, list-serves, and other means to seek to
12 identify as many potential threat, hoax, or other letter for which, I submit, there is probable cause to
13 believe were mailed by DARNELL RAY OWENS.

14          66.    Based on those efforts, the following are individuals, entities, or organizations that have
15 received such letters:

16          • Logan Park Apartments
17          • Sacramento LGBTQ Center
18          • Point Natomas Apartments
19          • J████ P████
20          • Sacramento Police Department
21          • West Sacramento Police Department
22          • A███ F████
23          • J████ P████
24          • Sacramento County Department of Revenue Recovery
25          • Human Rights Campaign
26          • First Baptist Church, Dallas, Texas
27          • Elk Grove Police Department
28          • California Legislative LGBT Caucus

AFFIDAVIT                                          13

1
- NCBW Headquarters

2
- Elk Grove Police Department

3
- Citrus Heights Police Department

4
- Sacramento County Sheriff Department

5
- J▮▮ L▮▮▮▮▮

6
- Roseville Police Department

7
- Los Rios Police Department

8
- Reno Police Department

9
- Galt Police Department

10
- San Antonio Police Department

11
- California Highway Patrol

12
- JFK High School, Sacramento

13
- Wichita Police Department

14
- Marysville Police Department

15
- Fire Marshall

16
- KTXL Fox40, Sacramento

17
- Criminal Investigations Service Center, Postal Inspection

18
- FACES LGBT night club in Sacramento

19
- California Peace Officers Association

20
- Anne Marie Schubert

21     67.     The following are the names used for the return address or as the purported senders of the

22   letters:

23
- ▮▮▮▮▮▮

24
- ▮▮▮▮▮▮▮

25
- ▮▮▮▮▮▮

26
- ▮▮▮▮▮▮▮

27
- ▮▮▮▮▮

28
- ▮▮▮▮▮▮▮

1  •
2  •
3  •
4  •
5  •
6  •
7  •
8  •
9  •
10  •
11  •
12  •
13  •
14  •
15  •
16  •
17  •
18  •
19  •
20  •
21  •
22  •
23  •
24  •
25  •
26  •
27  •
28  •

AFFIDAVIT

15

1    68.    I note that the investigation is on-going and that additional letters may exist that have not

2  yet been discovered.

3            8.    **Conclusion of Probable Cause**

4    69.    Based on the foregoing facts, including but not limited to the presence of DARNELL

5  RAY OWENS's DNA on the threat letters, the fact that they all appear to be written by the same

6  individual, that the letters are purportedly sent by R███████ S███████ or those who have some

7  connection to R███████ S███████ that this occurred after a dispute between R███████ S███████ and

8  DARNELL RAY OWENS and his sister, that some of the letters were purportedly sent by "S███

9  A███████" which is a name known only by her family including DARNELL RAY OWENS and which

10 included an address that A██████ gave to DARNELL RAY OWENS, and that on-line complaints that

11 appear connected to the threat letters were sent from an address affiliated with DARNELL RAY

12 OWENS, I submit that there is probable cause that DARNELL RAY OWENS mailed the letter to the

13 pastor of the First Baptist Church Dallas threatening to kill him, in violation of Title 18, United States

14 Code Section 876(c), and that DARNELL RAY OWENS mailed letters to the First Baptist Church and

15 to the Sacramento County Department of Revenue Recovery misrepresenting that the letters contained a

16 biological weapon, in violation of Title 18, United States Code Section 1038(a).  I submit that there is

17 probable cause that DARNELL RAY OWENS mailed the letter to the employees of KTXL Fox40,

18 Sacramento threatening to kill the named employees in violation of Title 18, United States Code Section

19 876(c).

20     C.    <u>**Probable Cause that Evidence and Instrumentalities of Offenses Will be Found At**</u>
       <u>**the Premises and on the Person of Darnell Owens, Including Digital Devices**</u>

21

22     70.    As noted above, bogus on-line complaints were sent to the FBI's tipline that were traced

23 to the IP Address ████████████████ Additionally, on or about June 23, 2018, Sacramento City

24 College received a message through the online Contact Us web form.  The message was purportedly

25 sent from ████████████ from the IP address ████████████  The message stated in part, "Fuck

26 Sacramento City College…I'll burn down the school…"

27

28

71.   The IP address ▮▮▮▮▮▮▮▮ is registered to ▮▮▮▮▮▮ at ▮▮▮▮▮▮▮▮ Sacramento, CA  95823, which is the PREMISES.  Based on open source information, ▮▮▮▮▮ is related to ▮▮▮▮▮▮▮, the current girlfriend of DARNELL RAY OWENS.

72.   Los Rios Police Department traced the Internet Protocol (IPv4) Address ▮▮▮▮▮▮▮ from the online message received by Sacramento City College on or about June 23, 2018, and determined that Sacramento City College student # ▮▮▮▮▮ logged into the Sacramento City College system from the same IP address on May 16, 2018 and again on June 21, 2018.  Student # ▮▮▮▮▮ belongs to ▮▮▮▮▮▮▮

73.   ▮▮▮▮▮▮▮ was interviewed by Los Rios PD in July 2018 and was told that someone was using her school email account. ▮▮▮▮▮ denied knowing that someone else was using her email account and denied knowing the individuals named in the messages to Los Rios PD.

74.   On October 17, 2018, October 22, 2018 and November 2, 2018, FBI surveillance observed DARNELL RAY OWENS and ▮▮▮▮▮▮▮ depart the PREMISES in the morning at around 8:00 am, travel to Sacramento City College where ▮▮▮▮▮ attended class, and then return to Subject Property at around noon. On each occasion, surveillance was continued until 2:00 pm with no further sightings.  On or about January 18, 2019 FBI surveillance again observed DARNELL RAY OWENS depart the premises around 8:00 a.m.

75.   DARNELL RAY OWENS has no known address, and has previously used his father's address on his college forms, and has no known employment.  Based on discussions with the Los Rios PD, it appears DARNELL RAY OWNES has received financial aid in the past based on minimal enrollment for 1-credit hour classes over the course of several years, but has no other known source of income.

76.   Based on these facts, I submit that there is probable cause to believe that Darnell Owens is using the PEREMISES as a current residence.

77.   In my training and experience, individuals typically keep envelopes, postage, and other implements of mailing or writing at their residences, including receipts of the purchase of such instrumentalities.

78.   Additionally, as discussed above, several of the letters were written on pieces of paper

1  that appear to have been torn or ripped from a spiral-bound notebook. In my training and experience,

2  individuals will typically keep such notebooks or similar paper sources at their residence.

3       79.    Further, as discussed above, the on-line threat to the Sacramento City College and the on-

4  line complaints to the FBI came from an IP address at the PREMISES.

5       80.    In my training and experience, individuals can use digital devices, including computers,

6  tablets, pads, and smartphones, to connect to the internet in order to send on-line complaints or

7  messages, including accessing the Sacramento City College network through which the on-line threat

8  was made. In my training and experience, the use of the IP address at the PREMISES demonstrates that

9  digital devices found at that location, or on the person of DARNELL RAY OWENS while at that

10  location, were used in connection with the offenses and will have further evidence, including attribution

11  evidence, in relation to the offenses.

12       81.    Further, as discussed above, letters were sent to numerous addresses throughout Northern

13  California and other locations domestically. In my training and experience individuals use search

14  applications on digital devices, including tablets, smartphones, and computers, to locate addresses. It is

15  also my training and experience, as discussed in great detail below, that such search information is

16  recoverable long after usage.

17       82.    Based on the foregoing, I submit that there is probable cause that evidence and

18  instrumentalities of violations of Title 18, United States Code, Sections 876(c) and 1038(a), as further

19  described in Attachment B, will be found at PREMISES, as further described in Attachment A-1,

20  including any digital devices found therein, and on the person of DARNELL RAY OWENS, as further

21  described in Attachment A-2, including any digital devices found thereon.

22            **IV.**    **TECHNICAL TERMS**

23       83.    Based on my training and experience, I use the following technical terms to convey the

24  following meanings:

25           a)  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric

26                address used by computers on the Internet. An IP address looks like a series of four

27                numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every

28                computer attached to the Internet must be assigned an IP address so that Internet traffic

AFFIDAVIT                                  18

1    sent from and directed to that computer may be directed properly from its source to its

2    destination.  Most Internet service providers control a range of IP addresses.  Some

3    computers have static—that is, long-term—IP addresses, while other computers have

4    dynamic—that is, frequently changed—IP addresses.

5    b)  Internet: The Internet is a global network of computers and other electronic devices that

6    communicate with each other.  Due to the structure of the Internet, connections between

7    devices on the Internet often cross state and international borders, even when the devices

8    communicating with each other are in the same state.

9    c)  Storage medium: A storage medium is any physical object upon which computer data can

10   be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-

11   ROMs, and other magnetic or optical media.

12   **V.      COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

13   84.    As described above and in Attachment B, this application seeks permission to search for

14   records that might be found on the PREMISES, as further described in Attachment A-1, and on the

15   person of Darnell Owens, as further described in Attachment A-2, in whatever form they are found.  One

16   form in which the records might be found is data stored on a computer's hard drive or other storage

17   media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or,

18   potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

19   85.    *Probable cause.*  I submit that if a computer or storage medium is found on the

20   PREMISES, there is probable cause to believe those records will be stored on that computer or storage

21   medium, for at least the following reasons:

22   a.  Based on my knowledge, training, and experience, I know that computer files or

23   remnants of such files can be recovered months or even years after they have been

24   downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files

25   downloaded to a storage medium can be stored for years at little or no cost.  Even when

26   files have been deleted, they can be recovered months or years later using forensic tools.

27   This is so because when a person "deletes" a file on a computer, the data contained in the

28

file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

86.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and

processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or

electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not

present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

    f.  I know that when an individual uses a computer to send threats, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

87.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that

1    information for things described in the warrant can take weeks or months, depending on

2    the volume of data stored, and would be impractical and invasive to attempt on-site.

3        b.   Technical requirements.  Computers can be configured in several different ways,

4            featuring a variety of different operating systems, application software, and

5            configurations.  Therefore, searching them sometimes requires tools or knowledge that

6            might not be present on the search site.  The vast array of computer hardware and

7            software available makes it difficult to know before a search what tools or knowledge

8            will be required to analyze the system and its data on the Premises.  However, taking the

9            storage media off-site and reviewing it in a controlled environment will allow its

10           examination with the proper tools and knowledge.

11

12       c.   Variety of forms of electronic media.  Records sought under this warrant could be stored

13           in a variety of storage media formats that may require off-site reviewing with specialized

14           forensic tools.

15       88.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the

16   warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that

17   reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a

18   later review of the media or information consistent with the warrant.  The later review may require

19   techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

20   many parts of a hard drive to human inspection in order to determine whether it is evidence described by

21   the warrant.

22       89.    Because several people share the PREMISES as a residence, it is possible that the

23   PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who

24   are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things

25   described in this warrant could be found on any of those computers or storage media, the warrant

26   applied for would permit the seizure and review of those items as well.

27

28

AFFIDAVIT                                24

## VI.   CONCLUSION

90.     I submit that this affidavit supports probable cause for a criminal complaint charging DARNELL RAY OWENS with a violation of Title 18, United States Code Section 876(c) – Interstate Threats, and of Title 18, United States Code Section 1038(a) – Hoax Involving Biological Weapons, and for the issuance of a warrant to arrest DARNELL RAY OWENS.

91.     I further submit that this affidavit supports probable cause for the issuance of warrant to search the PREMISES, as further described in Attachment A-1, including any digital devices found therein, and on the person of DARNELL RAY OWENS, as further described in Attachment A-2, including any digital devices found thereon. and seize the items described in Attachment B.

## VII.   REQUEST FOR SEALING

It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation, as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that criminals actively search online for criminal affidavits and search warrants via the Internet, and disseminate them to other criminals as they

///
///
///
///
///
///
///
///
///
///
///

1  deem appropriate, i.e., post them publicly online.  Premature disclosure of the contents of this affidavit

2  and related documents may have a significant and negative impact on the continuing investigation and

3  may severely jeopardize its effectiveness.

4      I swear under the penalty of perjury under the laws of the United States of America that the

5  foregoing is true and correct to my information and belief.

6

7                                              Respectfully submitted,

8

9                                              Stacy Landrus
                                               Special Agent
10                                             Federal Bureau of Investigation

11

12  Subscribed and sworn to before me on:  2-21-19

13

14  The Honorable Deborah L. Barnes
15  UNITED STATES MAGISTRATE JUDGE

16

17

18

19  Approved as to form by AUSA SHEA J. KENNY

20

21

22

23

24

25

26

27

28

AFFIDAVIT                                      26

### ATTACHMENT A-1

#### *The place to be searched*

The property to be searched is ▮▮▮▮▮▮▮▮, Sacramento, CA, further described as a single story residence, painted light tan with white trim. The residence has an attached, two-car garage and a short chainlink fence and gate across the front property line.  Below is a photograph taken from Google.



The search of the aforementioned premises shall include:

ANY AND ALL attachments, attics, basements, garages, safes, carports, outbuildings, appurtenances thereto, and all other areas within the curtilage, and shall include any and all digital devices found at the premises.

## ATTACHMENT A-2

### *The person to be searched*

The Person of DARNELL RAY OWENS, further described as a black male, 5'5" tall, weighing 150 pounds, with brown hair and brown eyes and California Driver's License ████████. Below is a picture from his California Driver's License.



SIGNATURE:



FINGERPRINT:

The search of the aforementioned person shall include:

ANY AND ALL clothing, and personal belongings including backpacks, wallets, briefcases and bags that are within DARNELL RAY OWENS's immediate vicinity and control at the location where the search warrant is executed, and shall include any and all digital devices found therein or thereon.

**ATTACHMENT B**

1.      All records relating to violations of 18 U.S.C. § 876(c) – Mailing Interstate Threats, and 18 U.S.C. § 1038(a) – Hoaxes Involving Biological Weapons, those violations involving DARNELL RAY OWENS and occurring after February 2018, including:

     a.   All stamps, postage, envelopes, or other instrumentalities of sending letters, parcels, or other items through the United States Postal Service or other carriers.

     b.   All receipts for the purchase of stamps, postage, envelopes, or other instrumentalities of mailing letters, parcels, or items.

     c.   All flour, baking soda, talc or other white powder substances.

     d.   All receipts for the purchase of flour, baking soda, or other white powder substances.

     e.   Records and information relating to the following individuals, entities, or organizations, including the addresses for associated with such individuals, entities, or organizations:









     f.   Records and information relating to or referencing a credit card number or

          account ending 6649 in the name of <span>████████</span>

     g.   Records and information relating to Sacramento City College student #

          <span>████████</span>

     h.   Records and information relating to communications with Internet Protocol

          address <span>████████████</span>

    2.      For any computer or storage medium whose seizure is otherwise authorized by

this warrant, and any computer or storage medium that contains or in which is stored records or

information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to

access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or

to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the

COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including

firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

web pages, search terms that the user entered into any Internet search engine, and

records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this

attachment.

3.      Routers, modems, and network equipment used to connect computers to the

Internet.

As used above, the terms "records" and "information" includes all forms of creation or

storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing

or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives,

videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.